IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CATHY FONDRK, Administrator          )
of the Estate of Kristen Tatar,      )
          Plaintiff,                 )
                                     )
     v.                              )     Civil Action No. 04-0900
                                     )
WESTMORELAND COUNTY, DANIEL          )
FITZPATRICK, an adult individual,    )
SANDY PALLATTO, an adult             )
individual, MARILYN McSPARRIN, an    )
adult individual, ARMSTRONG COUNTY,  )
STEPHEN FANCELLA, an adult           )
individual, and CARLA DANOVSKY, an   )
adult individual, PENNSYLVANIA       )
STATE UNIVERSITY, PENNSYLVANIA       )
STATE UNIVERSITY FOR ITS             )
COOPERATIVE EXTENSION AND OUTREACH   )
- WESTMORELAND COUNTY, NANCY         )
WALLACE, an adult individual,        )
          Defendants,                )
                                     )
     v.                              )
                                     )
ARMSTRONG COUNTY, and CARLA          )
DANOVSKY, an adult individual,       )
          Defendants and             )
          Third-Party Plaintiffs,    )
                                     )
     v.                              )
                                     )
JAMES TATAR and JANET CRAWFORD,      )
          Third Party                )
          Defendants.                )

MEMORANDUM and ORDER

Gary L. Lancaster,
District Judge.                              December 14, 2007

          This civil rights action arises out of the murder of

Kristen Tatar, a minor.  Plaintiff is Cathy Fondrk, Administrator

of the Estate of Kristen Tartar. She brings this action pursuant to 42 U.S.C. § 1983 ("section 1983"). Plaintiff alleges that Westmoreland County, Daniel Fitzpatrick, Sandy Pallatto, and Marilyn McSparrin (collectively, "Westmoreland County defendants"), Armstrong County, Stephen Fancella, and Carla Danovsky (collectively, "Armstrong County defendants"), Pennsylvania State University, Pennsylvania State University for its Cooperative Outreach-Westmoreland County, and Nancy Wallace (collectively, Penn State defendants), alone and in concert, violated Kristen Tartar's substantive due process rights under the Fourteenth Amendment to the United Sates Constitution by failing to protect Kristen from her abusive parents, third-party defendants James Tartar and Janet Crawford. Plaintiff also alleges state law common law claims of wrongful death, survival, third party beneficiary breach of contract, and spoliation against the Penn State defendants.

Defendants have moved for summary judgment. Specifically, defendants posit that plaintiff's section 1983 claim, based upon the state-created danger doctrine, fails as a matter of law. For the reasons that follow, the motions will be granted. [1]

The Court of Appeals for the Third Circuit aptly stated the predicament of the courts in these tragic section 1983 cases where children are abused at the hands of their own parents or

---

[1]

Individual defendant Stephen Fancella filed a motion for summary judgment on his own behalf [Doc. No. 170]. Plaintiff does not oppose his motion [Doc. No. 194 n. 1].

2

caretakers:

> One of the essential principles inherent in a multi-layered judicial system is the requirement to adhere to legal decisions pronounced by the highest court: in the case of the federal courts, that is the Supreme Court of the United States. Those decisions are supported by sound reasoning, and lower federal courts generally have no difficulty in applying the precedent. Occasionally, however, the factual situation in which the principle is tested is heartrending...

Bennett v. City of Philadelphia, 499 F.3d 281, 282 (3d Cir. 2007).

The court finds this to be one such case.


I. BACKGROUND

Unless otherwise indicated, the facts set forth below are undisputed.

On January 29, 1999, Kristen Tartar was born to Janet Crawford and James Tartar. Born prematurely, Kristen suffered from conditions which required a feeding tube. Kristen gained weight poorly due to insufficient calories. Between the time she was born and mid-December of 1999, Kristen was admitted to Children's Hospital of Pittsburgh three times for symptoms associated with her condition, missed doctor's appointments, and suffered from abnormally low weight gain. In December of 1999, Kristen was diagnosed as suffering from a non-organic failure to thrive.[2]

---

[2]

Failure to thrive is the terminology used to describe poor rate of growth in infancy or early childhood. Non-organic failure to thrive results from irregular or insufficient feedings and a

3

Because the family resided in Westmoreland County at that time, Children's Hospital contacted the Westmoreland County Children's Bureau ("WCCB") regarding Kristen's care. On December 14, 1999, WCCB obtained an emergency order for protective custody from the Court of Common Pleas of Westmoreland County, and Kristen was placed in temporary foster care.

In January of 2000, the Juvenile Division of the Court of Common Pleas of Westmoreland County held a hearing and declared Kristen a dependant child; however, the court returned Kristen to her parents' custody with the requirement that the parents meet various conditions regarding Kristen's care on an ongoing basis. The court further ordered WCCB to keep a weekly record of Kristen's weight and provide in-home services to the family.

WCCB engaged Pennsylvania State University and its Cooperative Extension and Outreach-Westmoreland County ("Penn State Extension") to provide parenting and family skills services to families. WCCB relied on Penn State Extension to provide transportation, help in the family service plan, make appointments and fill out financial assistance forms for the families in need. Penn State Extension family/youth advisor Pam Walmsley provided these services to Kristen's family. WCCB caseworker Sandy Pallatto relied on Walmsley to monitor Kristen's safety.

On April 13, 2000, the Westmoreland County Court of

---

deprivation of stimulation and nurturing.

4

Common Pleas held a permanency review hearing to determine whether Kristen's parents had complied with the court's order. The attorney and guardian ad litem appointed to represent Kristen, James Wells, participated in the hearing. Finding that the parents had complied, the court ordered that Kristen remain in her parents' custody. The court further ordered Kristen's parents to cooperate with all services provided to them, keep all scheduled medical appointments for Kristen, and immediately apply for Social Security Insurance benefits and medical insurance coverage for Kristen. WCCB was to continue to provide services to the family in the home.

Just a week later, however, WCCB requested an emergency custody authorization from the court because Kristen's parents failed to keep Kristen's medical appointments and follow through with obtaining Social Security Insurance. On April 24, 2000, the court held a hearing, and Kristen was again placed in foster care. Kristen's attorney and guardian ad litem participated in the hearing.

The court devised a permanency plan which required the parents to, inter alia, attend Kristen's medical appointments, cooperate with Penn State Extension, and undergo psychiatric evaluations. Over the course of the next 18 months, the parents substantially complied with the permanency plan. Kristen's parents, however, also moved twice while Kristen was in foster care without informing caseworkers of their whereabouts.

5

In August of 2001, the parents applied for Kristen's return. On September 17, 2001, the court held another permanency hearing. As before, Kristen's guardian ad litem, James Wells, participated in the hearing on her behalf. The testimony at the hearing indicated that Kristen had been spending three days and two nights per week with her parents and that they had taken Kristen to and from all of her medical appointments and were meeting all requirements of the court. As a result, the court ordered Kristen reunite with her parents. On September 21, 2001, the court entered an order to this effect and Kristen returned to her parents' custody. Although by this time Kristen's parents were residing in Armstrong County, the court ordered WCCB to continue to monitor Kristen and her parents for three months.

In May of 2002, WCCB caseworker, Ms. Pallatto, transferred Kristen's file to the Armstrong County Children & Youth Services ("ACCYS"). While Ms. Pallatto insists that she faxed to ACCYS 100 pages of family service plans, court orders, master's findings and recommendations and risk assessments, ACCYS denies ever receiving these materials. According to ACCYS, the only document received from WCCB was a risk assessment form dated March 2002 indicating that Kristen's parents posed no serious risk to Kristen. At this time, WCCB communicated to ACCYS that Kristen's parents neglected Kristen's needs each time WCCB's efforts waned.

ACCYS caseworker Steve Fancella requested information on

6

Kristen and her family from Ms. Pallatto at WCCB. Mr. Fancella, however, claims he never received the requested information from Ms. Pallatto. Mr. Fancella made several unsuccessful attempts to contact Kristen's parents. Mr. Fancella conducted a home visit on May 28, 2002. The parties appear to dispute whether Mr. Fancella actually saw Kristen during this visit.

On June 5, 2002, Kristen's file was reassigned from Mr. Fancella to ACCYS caseworker Carla Danovsky. Ms. Danovksy made several unsuccessful attempts to contact and visit Kristen's family. Ms. Danovsky discussed with David Fratta, ACCYS casework supervisor, her difficulties in reaching Kristen's family.

Mr. Fratta then communicated with WCCB supervisor, Dan Fitzpatrick, regarding Kristen's case and the agreement between WCCB and ACCYS to exchange addresses and risk assessments for families that moved between counties. Mr. Fitzpatrick agreed to provide Fratta a list of Kristen's medical providers so that ACCYS could notify the medical providers that the family relocated and to voice future medical concerns directly to Armstrong County. According to Fratta, Fitzpatrick indicated that the transfer of the file was merely a courtesy and that he was "ok" with ACCYS not pursuing Kristen's case after making phone calls to the medical providers. ACCYS received from WCCB a list of Kristen's medical providers and the March 2002 risk assessment which rated the risk to Kristen as low.

7

Ms. Danovsky contacted Kristen's healthcare providers, who voiced no concerns with regard to Kristen's health care needs. As a result, on November 4, 2002, ACCYS closed Kristen's file. ACCYS had received no new reports of medical issues pertaining to Kristen after her file was referred from WCCB in May of 2002.

On June 18, 2003, ACCYS received a telephone call from plaintiff. She was concerned that she had not seen Kristen after December. Ms. Danovsky visited Kristen's family that day. During this visit, Kristen's mother told Ms. Danovsky that Kristen was at a behavioral clinic for potty training problems, but refused to call the facility to verify that Kristen was there. Ms. Danovsky returned the following day and saw a healthy little girl at the home who she was told was Kristen.

The parties dispute whether the girl Ms. Danovsky met on June 19, 2003 was Kristen. Ms. Walmsley testified during her deposition that Ms. Danovsky called her after the visit to verify Kristen's appearance as Ms. Danovsky indicated to Ms. Walmsley that she did not know if the girl she saw was Kristen. Ms. Danovsky reported, however, that during the June 19, 2003 visit, Kristen responded by name, was eating crackers and did not appear to have any trouble swallowing. On June 20, 2003, Ms. Danovsky completed a risk assessment rating Kristen's risk of remaining with her parents as low. ACCYS again closed Kristen's case.

On July 1, 2003, Kristen's father put Kristen in the

8

attic of the family home. Kristen's parents left Kristen in the attic for seven consecutive days and nights with no food or water, but with a pacifier taped to her mouth to prevent her from crying. Sometime between July 1st and July 6th, Kristen died from dehydration and severe malnutrition. Kristen's eleven pound body was finally found by authorities, one month later, wrapped in garbage bags in a cooler behind the house.

Janet Crawford and James Tartar were convicted of the first degree murder of Kristen and are serving life sentences, without parole.

## II. STANDARD OF REVIEW

Fed.R.Civ.P. 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986) (internal quotation marks omitted). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. Id. In determining whether the dispute is genuine,

the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248-49.

To demonstrate entitlement to summary judgment, defendants, as the moving parties, are not required to refute the essential elements of the plaintiff's cause of action. Defendants need only point out the absence or insufficiency of plaintiff's evidence offered in support of those essential elements. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Once that burden has been met, plaintiff must identify affirmative evidence of record that supports each essential element of his cause of action. If plaintiff fails to provide such evidence, then he is not entitled to a trial, and defendants are entitled to summary judgment as a matter of law.

It is on this standard that the court has reviewed the instant motions for summary judgment and the responses thereto.


III. <u>DISCUSSION</u>

In order to recover in a section 1983 action, plaintiff must prove two essential elements: (1) defendants deprived Kristen of a right secured by the Constitution or laws of the United States; and (2) defendants deprived Kristen of this

10

federal right under color of any statute, ordinance, regulation, custom, or usage of any state or territory. Adickes v. S. H. Kress & Co., 398 U.S. 144, 150 (1970). Section 1983 does not create substantive rights. It only allows plaintiffs to recover damages for violations of rights protected by other federal laws or by the United States Constitution. Wilson v. Garcia, 471 U.S. 261, 278 (1985).

In this case, plaintiff argues that defendants violated Kristen's substantive due process right to be free from bodily harm resulting from her parents' criminal conduct. Plaintiff further argues that this right is protected by the Fourteenth Amendment to the United States Constitution. Plaintiff's argument, however, enjoys no support in the law.

A.   DeShaney

This case is governed by the United States Supreme Court's decision in DeShaney v. Winnebago County Dep't of Soc. Svcs., 489 U.S. 189 (1989). There, the Supreme Court made clear the general rule that governmental entities are not liable under the Due Process Clause for their failure to protect a citizen from crime. The facts of   DeShaney are in all material respects identical to those presented here. In DeShaney, a child named Joshua lived with his father who physically abused him.   When Joshua was admitted to the hospital with multiple bruises and abrasions, the treating physicians suspected child abuse and

11

contacted the local department of social services. The department
of social services immediately obtained an order from a juvenile
court judge who placed Joshua in temporary custody of the hospital.

The county then convened a child protection team to
assess Joshua's situation. DeShaney, 489 U.S. at 192. The team
decided there was insufficient evidence of child abuse to retain
Joshua in the custody of the court, thus, Joshua was returned to
his father's custody. Joshua was treated for suspicious injuries
on subsequent occasions. The department of social services
caseworker, who made monthly visits to the home, reported the
incidents and suspected physical abuse, but did nothing more.
Joshua's father continued to abuse him until he beat Joshua so
severely that Joshua suffered irreparable brain damage. Id. at
192-93. Joshua's father was tried and convicted of child abuse.
Id.

Joshua and his mother filed a section 1983 action
against the department of social services, certain of its
employees, and the county, based upon the defendants' alleged
violation of Joshua's substantive due process rights for failing to
protect him from his father's abuse. DeShaney, 489 U.S. at 193.
The Supreme Court held that no such violation occurred because "a
State's failure to protect an individual against private violence
simply does not constitute a violation of the Due Process Clause."
Id. at 197. The Court explained that the purpose of the Due

12

Process Clause is "to protect people from the State, not to ensure that the State protected them from each other." Id. at 196.

The Supreme Court touched on the state-created danger exception in DeShaney and determined that it did not apply to the facts of that case, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." DeShaney, 489 U.S. at 201.

### B. State-Created Danger Theory

Following DeShaney, an exception to this general non-liability rule emerged: the "state created the danger" to the plaintiff. DeShaney, 489 U.S. at 199-201.

Kneipp v. Tedder, 95 F.3d 1199, 1205 (3d Cir. 1996), illustrates the application of the state-created danger theory. In Kneipp, the plaintiff-husband and his visibly intoxicated wife were walking home on a January night when they were stopped by police for causing a disturbance. The police officer who stopped the couple questioned them separately then told the husband that he could go home; the couple's home was less than one block away. The husband proceeded home assuming the police officer would either take his wife to the police station or to a hospital.

The police officer did neither; instead, the police officer sent the wife home by herself. Kneipp, 95 F.3d at 1202. The wife was found about an hour later, unconscious, at the bottom

13

of an embankment. Due to her exposure to the cold, she suffered permanent brain damage. Id. at 1203.

The Kneipp plaintiffs brought a section 1983 claim on behalf of the wife against the police officers and the City of Philadelphia. Kneipp, 95 F.3d at 1203. The defendants moved for summary judgment, which was granted by the district court. On appeal, the Court of Appeals for the Third Circuit adopted the state-created danger theory; the Court of Appeals held, "[t]he conduct of the police, in allowing [the husband] to go home alone and in detaining [the wife], and then sending her home unescorted in a seriously intoxicated state in cold weather, made [the wife] more vulnerable to harm." Id. at 1209. The court emphasized the fact that the police officers increased the danger that the wife would suffer harm in her intoxicated state when they cut off her private source of protection (her husband) and abandoned her. Id. at 1210.

Thus, to establish a claim based upon the state-created danger theory, a plaintiff must satisfy all of the following elements: (1) the harm caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) some relationship existed between the state and the plaintiff that renders plaintiff a foreseeable victim; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or rendered

14

the citizen more vulnerable to danger than had the state not acted at all. Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006) (citations omitted).

Plaintiff attempts to characterize defendants' failures as affirmative actions which created an opportunity for harm which did not otherwise exist. Plaintiff argues that the Westmoreland County defendants' botched transfer of Kristen's case, failure to provide necessary documentation to ACCYS, and suggestion to ACCYS that there was no danger to Kristen "created the opportunity for harm to befall Kristen."

Yet, the Westmoreland County defendants had not been involved with Kristen and her family for more than 14 months before her death. Due to the sheer passage of time, the Westmoreland County defendants' failure to act could not have been a "fairly direct" cause of Kristen's harm. See Bright, 443 F.3d 276 (holding that state-created danger liability could not be based upon the defendants' "inexplicable" 10 week delay in detaining the man who killed the plaintiff's daughter while violating the probation he was serving for harassing the plaintiff's other daughter).

With regard to the Armstrong County defendants, plaintiff argues that they "created an opportunity for harm that otherwise did not exist by improperly investigating and then closing Kristen's case." This same argument was raised and

15

singularly rejected by the court of appeals in <u>Bennett v. City of</u> <u>Philadelphia</u>, 499 F.3d 281, 289 (3d Cir. 2007). "Liability requires affirmative state action; mere failure to protect an individual against private violence does not violate the Due Process Clause." <u>Bennett</u>, 499 F.3d at 288 (internal quotations omitted), (citing <u>Bright</u>, 443 F.3d at 284 (quoting <u>DeShaney</u>, 489 U.S. at 197)). As for the Penn State defendants, plaintiff posits that Walmsley created a dangerous situation for Kristen by withholding information from WCCB and ACCYS. This argument is also foreclosed by the aforementioned caselaw.

The harm to Kristen was hardly a direct result of defendants' inaction, singularly or in concert. Kristen had been in her parents' custody since September of 2001. Kristen's return to her parents' custody at that time resulted from a permanency hearing, in which Kristen's <u>guardian ad litem</u> participated, wherein the court found that both parents had fully complied with the permanency plan.

The unfortunate reality is that the danger to Kristen was her parents' incomprehensible, criminal conduct. The defendants did not create any new dangers to Kristen or cause Kristen to be any more vulnerable to her parents' inhumane treatment.

There has been a legion of cases in which an abused child has attempted to hold the county and attending social

16

services agencies liable for the harm suffered at the hands of his or her own parents or caretakers. We know of no instances in which the courts have found the governmental agency liable. On the contrary, the courts have consistently refused to hold the governmental agencies liable. See, e.g., Bennett, 499 F.3d at 289 (holding that defendants could not be held liable under state-created danger theory for babysitter's deadly beating of three year old because defendants' inactions did not result in the creation of dangers by the state); McComb v. Wambaugh, 934 F.2d 474, 483 (3d Cir. 1991) (holding social workers' inaction, which allowed "dangerous situation to ripen" not actionable under DeShaney) (citing Doe v. Milwaukee County, 903 F.2d 499, 502 (7th Cir. 1990) (children's civil rights action for abuse by mother "squarely barred by Deshaney" because mother was private, not state actor)); Clark v. City of Philadelphia, 2006 WL 2321574, *2 (E.D. Pa. Aug. 8, 2006) (dismissing the plaintiffs' section 1983 claim because the defendants, who returned the plaintiffs to the custody of their irresponsible mother and her sexually abusive boyfriend, did not create any new dangers; the defendants simply returned the plaintiffs to the condition that they would have been in had there never been an intervention).

While this case is undeniably tragic, state-created danger liability cannot be predicated upon the facts presented here. As in DeShaney, and unlike Kneipp, the defendants were aware

of the dangers to Kristen but did not do anything to render Kristen more vulnerable to them. Accordingly, defendants' conduct did not violate the Due Process Clause.

### C. Plaintiff's State Law Claims

In addition to her claims under section 1983, plaintiff charged the Penn State defendants with Pennsylvania common law claims of wrongful death, survival, third party beneficiary breach of contract, and spoliation. The court must, therefore, consider whether it should entertain these state law claims under the doctrine of supplemental jurisdiction. 28 U.S.C. § 1367(c)(3) (providing that the district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction).

Supplemental jurisdiction is designed to permit a party to try in one judicial proceeding all claims arising out of a common nucleus of operative fact, without regard to their federal or state character. The purpose of supplemental jurisdiction is to promote convenience and efficient judicial administration. See generally David D. Siegal, Practice Commentary: The 1990 Adoption of § 1367, Codifying "Supplemental" Jurisdiction, 28 U.S.C.A. § 1367, at 829-838 (1993).

Whether the court will exercise supplemental jurisdiction is within its discretion. See Growth Horizons, Inc.

18

v. Delaware County, Pa., 983 F.2d 1277, 1284 (3d Cir. 1993). The primary justification for exercising supplemental jurisdiction, however, is absent if the substantive federal claim is no longer viable.

There is no bright line for determining whether a supplemental state law claim should be dismissed when the federal law claims have been eliminated before trial. The Supreme Court has made clear, however, that under circumstances such as those in this case, the balance of factors, i.e., judicial economy, convenience, fairness, and comity, "will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).

Moreover, the clear direction of the Court of Appeals for the Third Circuit is that, unless extraordinary circumstances exist, it is inappropriate for a district court to proceed with supplemental state law claims where the underlying federal claim has been dismissed prior to trial. Rather, the proper course is for the district court to dismiss the state claim without prejudice. See Englert v. City of McKeesport, 872 F.2d 1144, 1152-53 (3d Cir. 1989) (referring to "pendent" state law claims); Lovell Mfg., A Div. of Patterson-Erie Corp. v. Export-Import Bank of the United States, 843 F.2d 725, 734-35 (3d Cir. 1988) (referring to "pendent" jurisdiction).

The court finds that no extraordinary circumstances

19

exist to justify maintaining jurisdiction over plaintiff's supplemental state law claims.

IV.      CONCLUSION

For the foregoing reasons, the motions for summary judgment filed by the Westmoreland County defendants, Armstrong County defendants, and Steven Fancella [Doc. Nos. 181, 172, 170] will be granted.  The motion for summary judgment filed by the Penn State defendants [Doc. No. 176] will be granted as to plaintiff's § 1983 claim, and denied as to plaintiff's remaining state law claims.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CATHY FONDRK, Administrator )
of the Estate of Kristen Tatar, )
        Plaintiff, )
         )
         )
        v. ) Civil Action No. 04-0900
         )
         )
WESTMORELAND COUNTY, DANIEL )
FITZPATRICK, an adult individual, )
SANDY PALLATTO, an adult )
individual, MARILYN McSPARRIN, an )
adult individual, ARMSTRONG COUNTY, )
STEPHEN FANCELLA, an adult )
individual, and CARLA DANOVSKY, an )
adult individual, PENNSYLVANIA )
STATE UNIVERSITY, PENNSYLVANIA )
STATE UNIVERSITY FOR ITS )
COOPERATIVE EXTENSION AND OUTREACH )
- WESTMORELAND COUNTY, NANCY )
WALLACE, an adult individual, )
        Defendants, )
         )
         )
        v. )
         )
         )
ARMSTRONG COUNTY, and CARLA )
DANOVSKY, an adult individual, )
        Defendants and )
        Third-Party Plaintiffs, )
         )
         )
        v. )
         )
         )
JAMES TATAR and JANET CRAWFORD, )
        Third Party )
        Defendants. )

## ORDER

AND NOW, this 14th day of December, 2007, IT IS

HEREBY ORDERED that:

The motion for summary judgment filed by Westmoreland County, Daniel Fitzpatrick, Sandy Pallatto, and Marilyn McSparrin [Doc. No. 181] is GRANTED;

IT IS FURTHER ORDERED THAT the motion for summary judgment filed by Armstrong County and Carla Danovsky [Doc. No. 172] is GRANTED;

IT IS FURTHER ORDERED THAT the motion for summary judgment filed by Stephen Fancella [Doc. No. 170] is GRANTED;

IT IS FURTHER ORDERED THAT the motion for summary judgment filed by Pennsylvania State University, Pennsylvania State University for its Cooperative Outreach-Westmoreland County, and Nancy Wallace [Doc. No. 176] is GRANTED as to Count I of the Second Amended Complaint, only, and is DENIED as to the remaining counts in the Second Amended Complaint [Doc. No 66].

IT IS FURTHER ORDERED THAT the court declines to exercise supplemental jurisdiction over the remaining counts of the Second Amended Complaint [Doc. No. 66], Counts II through X.

IT IS FURTHER ORDERED THAT plaintiff's remaining state law claims, Counts II through X of the Second Amended Complaint [Doc. No. 66], are dismissed without prejudice.

BY THE COURT:

_____ J.

cc:     All Counsel of Record

3